# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| SHIAMA RAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 5:15-cv-0528-CLS |
| | ) | |
| LEE BRASS FOUNDRY, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Shiama Ray, asserts claims against her employer, Lee Brass Foundry, LLC, for race discrimination, race-based harassment, and retaliation pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII").[1]  The case currently is before the court on defendant's motion for summary judgment,[2] and plaintiff's motion to strike portions of the declaration of Jerome Truss.[3]  Upon consideration of the motions, briefs, and evidentiary submissions, the court concludes that plaintiff's motion to strike should be denied, and defendant's motion for summary judgment should be granted.

---

[1] Count One of plaintiff's complaint is entitled "Statement of Plaintiff's Title VII and 42 U.S.C. § 1981 Racial Discrimination Claims." It encompasses claims for both race discrimination and race-based harassment.  *See* doc. no. 1 (Complaint), at 6-8. Count Two is entitled "Statement of Plaintiff's Title VII and 42 U.S.C. § 1981 Retaliation Claims."  *See id.* at 8-10.

[2] Doc. no. 42.

[3] Doc. no. 58.

# I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is 'only a guess or a possibility,' for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party

for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied). *See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. MOTION TO STRIKE

Plaintiff asks the court to strike portions of the declaration of Jerome Truss, defendant's Human Resources Manager, which was submitted in support of defendant's motion for summary judgment.[4]  Plaintiff asserts that the declaration is a "sham" because it contradicts Truss's prior deposition testimony.  The Eleventh Circuit has said that a district court

> may determine that an affidavit is a sham when it contradicts previous deposition testimony and the party submitting the affidavit does not give any valid explanation for the contradiction. *See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656 (11th Cir. 1984). However, "[t]his rule is applied sparingly because of the harsh effect it may have on a party's case." *Allen v. Bd. of Pub. Educ. for Bibb County*, 495 F.3d 1306, 1316 (11th Cir. 2007).  As such, courts must "find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit." *Id.*

---

[4] *See* doc. no. 58 (Motion to Strike); doc. no. 42-3 (Declaration of Jerome Truss), at ¶ 2 ("I am the Human Resources Manager at Lee Brass Foundry, LLC ('Lee Brass') and have served in that role since September of 2004.").

*Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010) (alteration in original).

Jerome Truss was deposed twice. During his first deposition, which occurred on March 31, 2016, he testified that he could not recall the details of any of plaintiff's complaints of discrimination, harassment, and retaliation, or of his investigations into those complaints, because he had been unable to locate the file containing his notes.[5] Between that deposition and his second on June 10, 2016, however, Truss found the missing file. Even so, plaintiff's attorney only asked him questions about complaints filed by *other employees*, and not plaintiff's complaints.[6] Accordingly, Truss provided no testimony during his second deposition about his investigation of plaintiff's complaints.

The declaration challenged by plaintiff was executed on August 30, 2016.[7] In the challenged paragraphs (numbers 15 through 31), Truss states that plaintiff did not complain to him or any other Human Resources employee about racial harassment, but she did complain about other workplace issues unrelated to race.[8] Truss also provides details about his investigation of plaintiff's complaints, and the reasoning

---

[5] Doc. no. 56-1 (First Deposition of Jerome Truss), at 82-93.

[6] *See* doc. no. 56-2 (Second Deposition of Jerome Truss), at 6-8.

[7] *See* doc. no. 42-3 (Declaration of Jerome Truss).

[8] *Id.* at ¶¶ 15-16.

behind the subsequent decision to place plaintiff on suspension.[9]

Plaintiff asserts that Truss's declaration testimony should not be allowed because it "contradict[s] Truss's deposition testimony that he was unable to remember the events surrounding Ray's complaints, his investigation, and her EEOC charge of discrimination."[10]  Plaintiff relies upon the Eleventh Circuit's unpublished opinion in *Bryant v. United States Steel Corporation,* 428 F. App'x 895 (11th Cir. 2011).  There, the district court dismissed the plaintiff's statutory discrimination claims as untimely because she had filed suit more than ninety days after the EEOC had mailed her right-to-sue letter. *Id.* at 896.

> In doing so, the court struck, as a "sham," an affidavit Bryant filed in response to U.S. Steel's motion for summary judgment, which averred that she did not receive the EEOC's letter until December 5, 2008 [*i.e.,* a date that fell within 90 days of the date on which she filed suit].  The court did so because *the affidavit squarely contradicted unequivocal testimony Bryant gave on deposition*, which was that she did not remember when she received the letter.

*Id.* (alteration and emphasis supplied).  The Eleventh Circuit panel held that the district court did not abuse its discretion in striking the affidavit, saying that:

> The affidavit, filed after her deposition had been taken and discovery had closed, supplied a specific fact that Bryant denied knowledge of when questioned on deposition.  *Notably, the affidavit presented no valid reason for Bryant's subsequent recollection that she received the*

---

[9] *Id.* at ¶¶ 19-30.

[10] Doc. no. 58 (Motion to Strike), at ¶ 16 (alteration supplied).

*letter on the specific date, December 5. For example, while Bryant was entitled to refresh her memory, her affidavit did not state that her recollection had been refreshed.* True, her attorney argued that her recollection had been refreshed, but counsel's argument is not evidence. *See Skyline Corp. v. NLRB*, 613 F.2d 1328, 1337 (5th Cir.1980).

*Bryant*, F. App'x at 897 (emphasis supplied).

In contrast, this case presents ample evidence of a valid reason for Truss's subsequent recollection of the details of plaintiff's complaints, his investigations, and the discipline plaintiff received. Even though Truss did not state so in his declaration, he testified in his second deposition that he had located an investigatory file with notes that refreshed his recollection about those matters.[11] Plaintiff's attorney had the opportunity to question Truss during the second deposition about his handling of plaintiff's complaints, but she chose not to do so. There is, therefore, nothing to prevent Truss from providing declaration testimony about matters for which his recollection was refreshed following his first deposition. Plaintiff's motion to strike is due to be denied.

## III. FACTS

### A. Plaintiff's Employment with Lee Brass Foundry

Lee Brass Foundry, LLC ("Lee Brass"), located in Anniston, Calhoun County, Alabama, is a facility that manufactures metal castings, fittings, and parts based upon

---

[11] *See* doc. no. 56-2 (Second Deposition of Jerome Truss), at 6-8.

specifications provided by its customers.[12]  It is not clear why this case was filed in the Northeastern division of the Northern District of Alabama, as opposed to the *Eastern division* which encompasses Calhoun County.  This court also does not understand why defendant did not file a motion to transfer, because the following footnote to defendant's answer records that counsel clearly were aware of the impropriety of venue in this division:

> Lee Brass denies that venue is appropriate in the Northeastern Division of the Northern District of Alabama.  Lee Brass maintains and operates a plant in Calhoun County, Alabama, which is located in this Court's Eastern Division.  The alleged events giving rise to Plaintiff's claims are limited to her employment in that Division.  *Therefore, this action should be transferred to the Eastern Division.*

Doc. no. 7 (Answer), at 1 n.1 (emphasis supplied).  As counsel apparently failed to appreciate, however, a footnote reference is *not* a substitute for a formal motion to change venue.

In any event, plaintiff, Shiama Ray, who is African-American, began working for Lee Brass as a "Machine Shop Operator A" on May 11, 2011.  She later moved up to a "Machine Operator C" position by using Lee Brass's internal bidding process.  During the fall of 2012, she became a "Quality Control Inspector."[13]

It was plaintiff's responsibility as a Quality Control Inspector to ensure that

---

[12] Doc. no. 42-1 (Declaration of David Smith), at ¶ 3.  *See* http://leebrass.com.

[13] Doc. no. 42-2 (Deposition of Shiama Ray), at 14-16, 22-23.

products were produced to the customer's specifications.[14]  Plaintiff functioned as a "floater" in the Quality Control Department.  She received training in every division of that department, and could fill in for any Quality Control employee when needed. Even so, she worked primarily in the Machine Shop and Cleaning Room.[15]  The *nature of the tasks plaintiff was required to perform* generally did not vary from day to day, *but the volume of her work* did vary according to the number of parts being produced on any given day, which in turn varied according to the volume of orders received from customers.[16]  Lee Brass employees used the term "hot jobs" to describe situations in which there was a particular rush to complete a part within a short period of time.  "Hot jobs" increased the stress level in the facility because they were "a pressure situation where it's being rushed through to get finished so that it can meet the customer's request."[17]

Lance Nichols, a white male, was plaintiff's direct supervisor from the time she started working in Quality Control until the latter part of 2015.[18]  Nichols' direct supervisor was the occupant of the "Quality Control Manager" position.  Bill Boozer

---

[14] *Id.* at 27; doc. no. 42-1 (Declaration of David Smith), at ¶ 8.

[15] Doc. no. 42-2 (Deposition of Shiama Ray), at 20-21; doc. no. 42-1 (Declaration of David Smith), at ¶ 9.

[16] Doc. no. 42-2 (Deposition of Shiama Ray), at 41-42; doc. no. 42-1 (Declaration of David Smith), at ¶¶ 9, 11.

[17] Doc. no. 42-2 (Deposition of Shiama Ray), at 43-44.

[18] *Id.* at 32.

occupied that position until April of 2013, when David Smith took over as Quality Control Manager.[19]

## B.  Lee Brass's Human Resources Department and Policies

Lee Brass is an equal opportunity employer. It has policies prohibiting workplace discrimination and harassment based upon race, among other protected characteristics.[20] The "Workplace Harassment Policy" found in the Lee Brass Employee Handbook contains the following instructions about the manner of reporting complaints of harassment or discrimination:

> Any associate who believes that actions or words by a manager, supervisor, co-worker, customer or vendor constitute harassment has a responsibility to report or complain about the situation as soon as possible. Such a report or complaint should be made to the associate's supervisor, department manager, Human Resource Manager, Operations Manager, or CFO at Lee Brass.

> If the immediate supervisor is the source of the alleged discrimination or sexual harassment, the associate should report the problem to the department manager, Human Resources Manager, Operations Manager, or the President/CEO.

> If the plant department manager, Operations Manager, or the CFO is the source of the alleged discrimination, the associate should report the problem to the next higher level of management, Human Resource Manager, or President/CEO.

Doc. no. 42-3 (Lee Brass Employee Handbook), at ECF 79 (Workplace Harassment

---

[19] *Id.* at 32-33; doc. no. 42-1 (Declaration of David Smith), at ¶ 2.

[20] Doc. no. 42-3 (Declaration of Jerome Truss), at ¶¶ 4-5.

Policy, § B).[21]

The Lee Brass Employee Handbook also contains a "Problem Resolution Policy" that addresses workplace issues that do not arise from unlawful discrimination. That policy states:

> The Company welcomes a free exchange of thinking between associates and management at all levels. The Company's policy is to give prompt, careful and courteous consideration to all associates' complaints and problems arising out of the work situation. We believe this is the best method of communicating with one another and ensuring that our policy of fair employment practices is being enforced.

> The following procedures will apply to problems that arise on the job:

> 1. Discuss the problem with your supervisor. He/she has been instructed to make every effort to deal with your problems in a prompt and courteous fashion, and will be able to solve most problems.

> 2. If you are not satisfied with the answer from your supervisor, you may submit the matter to the department manager. He/she will review the situation with you and give you an immediate answer, if possible. Otherwise, you will be told approximately when to expect an answer.

> 3. If the problem is not resolved as outlined above, the matter

---

[21] "ECF" is an acronym formed from the initial letters of the name of a filing system that allows parties to file and serve documents electronically (*i.e.*, "Electronic Case Filing"). Bluebook Rule B7.1.4 allows citation to page numbers generated by the ECF header. *The Bluebook: A Uniform System of Citation*, at 21 (Columbia Law Review Ass'n *et al.* eds., 19th ed. 2010). Even so, the Bluebook recommends against citation to ECF pagination in lieu of original pagination. Consequently, unless stated otherwise, this court will cite to the original pagination in the parties' pleadings. When the court cites to pagination generated by the ECF header, it will, as here, precede the page number(s) with the letters "ECF."

will be submitted to the Human Resources Manager. The Human Resources Manager will review the situation with you and give you an immediate answer, if possible, or you will be informed approximately when to expect an answer.

4.    If the situation is not resolved to your satisfaction as outlined above, a meeting will be arranged with the President.

The Company believes in its associates and the need to maintain open lines of communication. We sincerely hope that you will utilize the above procedure if you have a problem.

*Id.* at ECF 66 (Problem Resolution Policy).

The company's disciplinary policy is stated as follows in the Employee

Handbook:

The purpose of this policy is not primarily to punish, but to correctively encourage behavior modification to discourage repetition of misbehavior by the offender or by another following their example. Record of disciplinary action will become part of a[n] associate's personnel file.

Before administering discipline, the manager should be sure they have all the facts. The associate's past record should be examined in the Human Resources office to determine if the associate has had any previous violations. Associates should be given ample opportunity to present their side before any final decision is made as to the discipline to be administered. The review and decision to issue disciplinary action is to be done in a timely manner.

•    A verbal counseling should represent a direct attempt of the manager and associate to deal with a breach of rules at an early stage. It should clarify, in specific terms, what behavior needs attention and define a method and a

reasonable time for correction.

- Written warnings represent a more formalized means of correcting behavior and become part of an associate's work record. Should associates have any additional factors or knowledge of extenuation [*sic*] circumstances relating to the incident they should be discussed at this time. The supervisor or department manager will then consider this information when deciding what discipline to administer. In order to maintain consistency, Human Resources must be involved in the preparation of any written warnings. Human Resources will insure [*sic*] that documentation of the event leading to any action is made a part of the offending associate's record.

All disciplinary actions will be cumulative for a rolling period of 6 (six) months. Group violations are cumulative.

The usual disciplinary steps will be:

| | |
|---|---|
| Informal Step | Verbal Counseling |
| First Step | Written Warning |
| Second Step | Final Written Warning |
| Third Step | Subject to Discharge |

Depending upon the violation, the procedure may be at any of the above steps and other required condition/actions may have to be met.

*Id.* at ECF 64-65 (Plant Rules & Disciplinary Procedures Policy) (alteration supplied).

Jerome Truss, Lee Brass's Human Resources Manager, testified that the company may also issue a suspension before resorting to termination.[22]

Lee Brass also has a policy of giving preference to current employees for open

---

[22] Doc. no. 42-3 (Declaration of Jerome Truss), at ¶¶ 3, 7.

positions.  The company posts job openings by placing written notices of the opening in the employee break room, near the employee time clock, and in the Human Resources Office.  Some job openings are also verbally announced by department supervisors during weekly departmental meetings.  Employees who are interested in a posted position sign their name to a bid sheet posted in the Human Resources Office.[23]  Jerome Truss attested that:

> There are no factors about an employee's employment that would preclude him or her from signing their name to the posting or bidding on an open job.  However, disciplinary and other issues could be weighed when considering whether an employee should be awarded a job he or she has bid on.

Doc. no. 42-3 (Declaration of Jerome Truss), at ¶ 11.  Plaintiff, on the other hand, testified that she was told from the beginning of her employment with Lee Brass that if an employee was in disciplinary trouble, she could not write her name on a bid sheet for an open job.  She was not asked, and did not specify whether she was told that by a member of management, or by other employees, and she did not know whether her belief was founded upon a "formal policy of Lee Brass."[24]

Plaintiff acknowledged receiving a copy of the Employee Handbook when she

---

[23] Doc. no. 42-3, at ECF 25-27 (Lee Brass Employee Handbook Job Postings and Filling Vacancies Policy); doc. no. 42-3 (Declaration of Jerome Truss), at ¶¶ 8-11; doc. no. 42-2 (Deposition of Shiama Ray), at 16-18.

[24] Doc. no. 42-2 (Deposition of Shiama Ray), at 165-67.

began working at Lee Brass.[25] Lance Nichols, plaintiff's direct supervisor, testified that he had never been trained on the Employee Handbook, including any of Lee Brass's anti-harassment or anti-discrimination policies.[26] David Smith, the Quality Control Manager (and, therefore, Nichols's direct supervisor), testified that he was not aware of any Lee Brass employees receiving formal training about discrimination, harassment, or retaliation.[27] Robert Smith, the Company President, testified that, other than discussions with Human Resources Manager Jerome Truss, he never personally investigated any allegations of harassment or talked to any employees about racial issues at the plant.[28]

## C. Plaintiff's Allegations of Harassment and Racial Incidents at Work

### 1. Jackie Hogan's comment

Soon after plaintiff transitioned into the "Quality Control Inspector" position, Lance Nichols (plaintiff's direct supervisor) told her that Jackie Hogan, a white female co-worker, had said of plaintiff, "that black girl knows everything."[29] There is no evidence that Hogan ever made such a comment directly to plaintiff, or that

---

[25] Doc. no. 42-2 (Deposition of Shiama Ray), at 193-94; *see also id.* at ECF 74 (Exhibit 5, Handbook Receipt Acknowledgment).

[26] Doc. no. 42-5 (First Deposition of Lance Nichols), at 36-37.

[27] Doc. no. 42-4 (Deposition of David Smith), at 92.

[28] Doc. no. 56-5 (Deposition of Robert Smith), at 114.

[29] Doc. no. 42-2 (Deposition of Shiama Ray), at 124.

plaintiff heard the comment.

## 2. Refusal to train

When plaintiff became a Quality Control Inspector during the fall of 2012, Lance Nichols told her that she would be training as a backup for the position of Quality Control Specialist.[30] The Quality Control Specialist is located in the front office of the Lee Brass facility, and works directly with the sales department to make sure that all the required paperwork is sent with each outgoing order.[31] Plaintiff did not receive training for that position, and when she asked Nichols why, he informed her that Diane Sparks, a white female who then occupied the Quality Control Specialist position, refused to train plaintiff.[32] Plaintiff does not know why Sparks refused to train her, but Nichols informed her that Sparks had also refused to train another black female employee in the past.[33]

David Smith, the current Manager over the Quality Control Department, testified that the backup for the Quality Control Specialist usually comes from the Engineering Department, rather than the Quality Control Department, because the position requires some specialized engineering knowledge.[34] Plaintiff's supervisor

---

[30] *Id.* at 64-65.

[31] *Id.* at 45.

[32] *Id.* at 65-66.

[33] *Id.* at 66-68, 170-71.

[34] Doc. no. 42-4 (Deposition of David Smith), at 260-64.

at the time of her deposition, Naylon Williams, a white woman, was trained to fill in for the Quality Control Specialist position, but she had engineering experience.[35]

### 3. Martin Luther King Day comments

The national holiday celebrated on the third Monday of January each year as the birthday of Dr. Martin Luther King, Jr. (who actually was born on January 15, 1929) is not a holiday for Lee Brass employees. Soon after plaintiff arrived for her shift on Martin Luther King Day in 2013, Curtis Clay, the Receiving Clerk (a non-supervisory position) and a white male,

> said in a jokingly [*sic*] voice, what are you doing here today. And I said excuse me. And he said what are you doing here today, isn't this your guy's [*sic*] holiday. And I said Curtis, that is not funny, you know. And he laughed and Gary Stinson [another white male employee who was standing nearby] laughed.

Doc. no. 42-2 (Deposition of Shiama Ray), at 76 (alterations supplied). Plaintiff walked directly to the office of Bill Boozer, who then was the Quality Control Manager, to report the comment. On the way to Boozer's office, plaintiff encountered Lance Nichols, her direct supervisor, and she also reported the incident to Nichols. When Boozer learned what had happened, he immediately went to talk to Curtis Clay's supervisor, but plaintiff does not know what occurred after that.[36]

---

[35] *Id.*; *see also* doc. no. 42-2 (Deposition of Shiama Ray), at 170-71.

[36] Doc. no. 42-2 (Deposition of Shiama Ray), at 76-78.

Plaintiff did not make an additional report of the incident to the Human Resources Department, and there is no evidence that she subsequently heard similar comments from Clay.[37]

Approximately two days later, Jackie Hogan approached plaintiff and asked why she had "told on" Curtis Clay.[38] Hogan told plaintiff, "you know he was just playing with you," and plaintiff responded, "well, I don't play like that and I didn't think it was funny."[39] After that, Hogan "started yapping" and plaintiff "just walked away from her because [she] didn't want to go into it any further."[40]

### 4. Jason Alexander's use of racial slurs and offensive posters

Sometime during the early part of 2013, a white employee named Jason Alexander said "those n's are always tearing something up."[41] He did not direct the comment at any particular employee; he just "said it out open in the open" so that other employees could hear.[42] Alexander also hung politically opinionated posters on the wall of his work space, including a photo of President Obama dressed in native

---

[37] *Id.* at 79-80.

[38] *Id.* at 189.

[39] *Id.*

[40] *Id.* (alteration supplied).

[41] Doc. no. 56-2 (Second Deposition of Jerome Truss), at 169-70; *see also* doc. no. 56-1 (First Deposition of Jerome Truss), at 127.

[42] Doc. no. 56-2 (Second Deposition of Jerome Truss), at 170; *see also* doc. no. 56-1 (First Deposition of Jerome Truss), at 128.

African dress, and another photo of the President delivering a speech with the caption, "Four more years of hell: Obama wins re-election," and a cross-hair drawn on the President's forehead.[43]   Lee Brass issued Alexander a written warning on February 25, 2013, stating:

> This letter is being issued to you due to a couple of different incidents that we need to resolve and have a general understanding. We expect our associates to treat each other with respect and our behaviors must be contained in certain guidelines.
>
> The first incidents happen [*sic*] a few months ago, when all associates were informed during one of our Safety Meetings that any materials on walls, lockers, or work areas that could be offensive to others must come down. You area had several posting [*sic*] of materials that were not appropriate and had to be taken down by a manager. This type of behavior is not appropriate and will not be tolerated in te workplace.
>
> The second incident happen [*sic*]  a couple of weeks ago, when Foundry III brought a pattern down to be worked on. It was brought to our attention that you used the "N" word in making a comment (paraphrasing — those "N" are always tearing something up). These types of comments will not be tolerated.
>
> This letter will be going in your personnel file and if this type of behavior continues, then more severe disciplinary actions will be taken.

Doc. no. 56-19, at ECF 2 (February 25, 2013 letter).   There is no evidence that plaintiff personally heard Jason Alexander make any racially offensive comments, or that she saw the posters hanging in his work area.

---

[43]   Doc. no. 56-2 (Second Deposition of Jerome Truss), at 173-76; *see also* doc. no. 56-19, at ECF 4 and 5 (photos).

## 5. Employees using the term "boy" in a racially charged way

At some unspecified time during the five-year period preceding Jerome Truss's March 31, 2016 deposition, white employee Vincent Gunter called his black co-worker, Marquis Mason, "boy." Gunter and Mason had a history of conflict, but Truss believed that Gunter was the more aggressive of the pair, so he concluded that a suspension was appropriate. Gunter received a letter in his file, was suspended for three days, and was told that if he ever said anything similar again, his employment would be terminated.[44]

At another unspecified time during the five-year period preceding Jerome Truss's March 31, 2016 deposition, Ray Wood, a white supervisor in the foundry, called another black employee "boy." Wood was suspended for three days but was allowed to retain his position as a supervisor.[45]

There is no evidence that plaintiff personally heard anyone call a fellow African-American employee "boy."

## 6. Tony Poland's comments to John Foster

Tony Poland, a white employee, was accused at some unspecified time of

---

[44] Doc. no. 56-1 (First Deposition of Jerome Truss), at 156-60. The record does not indicate whether Gunter's suspension was with or without pay.

[45] *Id.* at 164-66. The record does not indicate whether Mr. Wood's suspension was with or without pay.

saying that John Foster, a black employee, had obtained "a white man's job."[46] Foster denied the accusation, and Poland was never disciplined for the incident.[47] There is no evidence that plaintiff personally heard Poland's comment.

### 7. Harassment by Jackie Hogan, Teresa Turner, and Donald Wade

Plaintiff "didn't have any issues" with co-workers Jackie Hogan, Teresa Turner, and Donald Wade — all of whom are white — before she complained about Curtis Clay's Martin Luther King Day comment.[48] After that, however, and for approximately a month and a half beginning in March or April of 2013, plaintiff's work station was moved to the back of the machine shop for the purpose of checking a large volume of parts produced by the testing department. Nichols prevented plaintiff from performing tasks that she previously had performed, like audits. He also removed the computer from plaintiff's work space and directed her focus on visually inspecting parts.[49] Hogan, Turner, and Wade, who worked in the testing department, began rushing plaintiff to finish her work on "hot jobs" coming through the Quality Control Department.[50] Notably, none of those individuals ever made any

---

[46] *Id.* at 230.

[47] *Id.* at 231.

[48] Doc. no. 42-2 (Deposition of Shiama Ray), at 190.

[49] *Id.* at 172-75.

[50] *Id.* at 89-92.

race-based comments to plaintiff.[51]  Even so, she complained to her supervisor Lance

Nichols and Quality Control Manager David Smith that Hogan, Turner, and Wade

had been "harassing" her.  She did not characterize the "harassment" as race-based,

but stated that it did not begin until after she had complained about Curtis Clay's

Martin Luther King Day comment.[52]

### 8. Other alleged harassment by Jackie Hogan

On a couple of occasions during April or May of 2013, Jackie Hogan asked

plaintiff whether she would "go on" food stamps if plaintiff ceased working at Lee

Brass.  Other employees were within earshot when Hogan asked those questions, but

Hogan directed the question specifically to plaintiff.  Plaintiff interpreted the

comment as suggesting that all black people are on food stamps.[53]

On another unspecified occasion after February 26, 2012, Hogan, Turner, and

Wade were discussing the tragic shooting of Trayvon Martin, a seventeen-year-old

African-American male who was fatally shot in Sanford, Florida, by George

Zimmerman, a white "neighborhood watch" volunteer.  When asked her opinion

about the shooting, plaintiff said that she did not believe anyone deserved to be shot,

and then attempted to divert the conversation to another subject.  Nevertheless, Hogan

---

[51] *Id.* 96-97.

[52] *Id.* at 88, 97-98, 102-05.

[53] *Id.* at 120-21.

stated that Martin deserved to be shot because he had "jumped on" Zimmerman.[54] Plaintiff believed the comment was racially motivated, because she was the only African-American person in the area when the comment was made.[55] After the statement, plaintiff attempted to avoid Jackie Hogan. As a consequence, she did not know whether Hogan made any other race-based comments.[56]

During November of 2015, Curtis Clay heard Jackie Hogan say that, when she recently traveled to Disney World, she had trouble getting around because there were so many "niggers" in the hotel.[57] There is no evidence that plaintiff personally heard that comment.

During January of 2014, Michael Judkins, a black employee, accused Hogan of saying that she might have to work with "niggers," but she did not have to eat with them. When Truss investigated that accusation, Hogan denied making the comment, and there is no indication that she was disciplined.[58] There also is no evidence that plaintiff heard Hogan make the comment.

### 9. Plaintiff's stool

During April of 2013, Jackie Hogan, Teresa Turner, and Donald Wade

---

[54] Doc. no. 42-2 (Deposition of Shiama Ray), at 119, 122-23.

[55] *Id.* at 123.

[56] *Id.* at 187-88.

[57] Doc. no. 56-3 (Deposition of Curtis Clay), at 97-98.

[58] Doc. no. 56-1 (First Deposition of Jerome Truss), at 116-17.

complained to supervisor Lance Nichols about plaintiff being allowed to sit on a stool during part of the work day. Nichols asked plaintiff to remove the stool from her work area. Plaintiff initially complied, but then asked Quality Control Manager David Smith if she could sit on the stool to check small parts in order to avoid bending over. Smith agreed, so plaintiff retrieved the stool and returned it to her work area.[59] Approximately three days later, however, plaintiff found the stool missing when she reported to her work area. She did not search for another stool.[60]

David Smith testified that Lance Nichols should have asked him, or a member of the Human Resources team, before summarily telling plaintiff that she could no longer use the stool.[61]

Notably, no other Quality Control Inspector was permitted to sit on a stool for work, but employees in other departments were permitted to do so. The decision of whether to allow an employee to use a stool depended upon the type of job performed, and the ergonomics of the employee's work area.[62]

### 10. Plaintiff calls the police and is later suspended

Lance Nichols testified that plaintiff complained to him "every other day"

---

[59] Doc. no. 42-2 (Deposition of Shiama Ray), at 98-101.

[60] *Id.* at 176-77.

[61] Doc. no. 42-4 (Deposition of David Smith), at 38-39.

[62] *Id.* at 40; doc. no. 42-2 (Deposition of Shiama Ray), at 178-80.

about being asked to check parts, and about other employees "picking on her."[63]  One of those complaints occurred on Wednesday, May 30, 2013, when plaintiff complained to Nichols that Hogan, Turner, and Wade had become more and more aggressive in rushing her to complete "hot jobs" during the previous week, and that she was "getting tired."[64]  Nichols told plaintiff that he would "handle" the situation, but plaintiff did not perceive any change in her work environment.[65]  Plaintiff also complained to David Smith and Jerome Truss about being rushed.[66]  At some unspecified point after plaintiff lodged a complaint with Truss,  he told her that she was being "too vocal."[67]

Despite plaintiff's complaints, her co-workers continued to rush her to finish "hot jobs."  Plaintiff described the tone of their voices as "aggressive," but they did not raise their voices, curse, get in plaintiff's face, utter race-based comments, or make physical threats.[68]  Because the work environment did not change, plaintiff called the police from her cell phone in a bathroom approximately thirty steps from her work station.[69]  She explained her decision to place the call as follows:

---

[63] Doc. no. 42-2 (Deposition of Shiama Ray), at 72-73.

[64] *Id.* at 133-34.

[65] *Id.* at 134.

[66] Doc. no. 42-4 (Deposition of David Smith), at 205-08.

[67] Doc. no. 42-2 (Deposition of Shiama Ray), at 221.

[68] *Id.* at 130-32.

[69] *Id.* at 134-37.

I felt like the harassment had gone on too long and nothing was being done about it and I was afraid of what was going to happen.

. . . .

If they were getting — I felt like they were getting aggressive. I didn't know if — I didn't know what was going to happen. I felt the need to have it end that day, you know, something got to be done. And like I said, I had been complaining about it and nothing had been done about it. So I felt the need to call the police.

When you are growing up, you know, something going wrong, you call the police for help, you know. And I felt like all the opportunities or the chances I got to ask somebody to help me, I was being denied help, so I called the police because I didn't know what else to do.

Doc. no. 42-2 (Deposition of Shiama Ray), at 135-36 (ellipsis supplied). When asked why she did not report the continued harassment to Lance Nichols or David Smith, as opposed to calling the police, plaintiff responded:

I was just tired, to be honest with you, beating a dead horse. I didn't think that — I don't know why I didn't go to David Smith. I don't know if he was even in the building that day. But I had been to Lance so many times about this issue and it wasn't being dealt with. And I don't know if he was relaying it to David Smith, but, you know, David Smith was aware of what was going on and I just — I got to the point where it's either call the police or walk off my job and I need my job, so I felt no — I had no other choice as far as what I was thinking. I didn't want it to escalate to somebody that would be me fired or anybody else. I just wanted it to stop.

*Id.* at 138-39.

After she placed the telephone call to the police, plaintiff walked to Jerome

Truss's office, crying, to inform him that the police would soon be arriving. Truss was out to lunch, but he returned after another Human Resources employee called him.[70] Plaintiff told Truss that Hogan, Turner, and Wade had been harassing her, and that she did not know what was going to happen. She also said that she "kept telling Lance [Nichols] and nothing was being done."[71] Plaintiff told Truss that she wanted to file charges of harassment with the police, but Truss asked plaintiff to let him handle the situation internally, and plaintiff agreed. When the responding officer arrived at the Lee Brass facility, plaintiff and Truss walked to the gate together to inform the officer that plaintiff did not want to press charges because she had agreed to allow Lee Brass to handle the matter internally.[72]

Plaintiff and Truss continued to discuss the situation after they returned to Truss's office, and Truss began to investigate.[73] Plaintiff did not tell Truss that she had been subjected to harassment or discrimination *because of her race.* She did say, however, that the harassment did not begin until after she complained about Curtis Clay's Martin Luther King Day comment.[74]

As part of his investigation into the May 31 incident, Truss interviewed Jackie

---

[70] *Id.* at 141-43.

[71] *Id.* at 143-44 (alteration supplied).

[72] *Id.*

[73] Doc. no. 42-2 (Deposition of Shiama Ray), at 144-45.

[74] *Id.* at 221; doc. no. 42-3 (Declaration of Jerome Truss), at ¶¶ 16, 19.

Hogan, Teresa Turner, Donald Wade, Lance Nichols, David Smith, and Curtis Clay.[75] Hogan, Turner, and Wade informed Truss that they often told plaintiff which jobs needed to be prioritized, but they denied harassing her because of her race.[76] Nichols informed Truss that plaintiff had complained to him "on a few occasions" that Hogan, Turner, and Wade were rushing her, but Nichols had never observed any of those individuals acting inappropriately toward plaintiff.[77] Some of the manufacturing managers reported to Truss that, after plaintiff called the police, the production process was momentarily disrupted by employees stopping work to talk to each other about the incident. Even so, production never came to a complete stop.[78]

Five days later, on Monday, June 4, 2013, plaintiff complained to Lee Brass's security guard that someone in a small white car had been harassing her. The security guard brought the complaint to Lance Nichols's attention, and Nichols forwarded it to Jerome Truss in Human Resources. There is no indication in the record that anything was done in response.[79]

On some unspecified later date, Jerome Truss met with Lance Nichols and David Smith to discuss his investigation findings and determine the appropriate

---

[75] Doc. no. 42-3 (Declaration of Jerome Truss), at ¶ 21.

[76] *Id.* at ¶ 22.

[77] *Id.* at ¶ 23.

[78] *Id.* at ¶ 24; *see also* doc. no. 42-5 (Deposition of Lance Nichols), at 95-96.

[79] Doc. no. 42-7 (Second Deposition of Lance Nichols), at 158-60.

course of action.[80]   The three men agreed that plaintiff had not been harassed by

Hogan, Turner, or Wade, all of whom had simply been doing their jobs when they

directed plaintiff to give priority to certain tasks.[81]   They also agreed that plaintiff

should have brought her concerns to any (or all) of them before taking the extreme

measure of calling the police, and they concluded that plaintiff's decision to call the

police was a violation of company policies, because plaintiff had not been threatened,

and she did not fear for her personal safety.[82]   Moreover, Smith and Truss were

concerned that, if plaintiff was not disciplined for unnecessarily calling the police,

other employees might believe that it was acceptable to call the police to resolve

minor disputes.[83]   As a result, Truss determined that he, Smith, and Nichols should

meet with plaintiff to explain what the investigation had revealed, that plaintiff

should be issued a written discipline, and that plaintiff should be suspended for three

days.[84]

> During the meeting, which took place on June 17, 2013, Smith and Truss
> explained to [plaintiff] that we did not find that she was being harassed
> but rather asked to prioritize certain jobs, that she violated policy in

---

[80] Doc. no. 42-3 (Declaration of Jerome Truss), at ¶ 25.

[81] *Id.* at ¶ 26.

[82] *Id.* at ¶ 27.

[83] *Id.* at ¶ 28.

[84] *Id.* at ¶ 29. The record does not indicate whether Gunter's suspension was with or without pay.

> calling the police rather than making a report to one of us or any supervisor or manager, that she was away from her job for an extended period of time without justification, and we informed her that she was being suspended for failing to follow procedure and these other infractions.

Doc. no. 42-3 (Declaration of Jerome Truss), at ¶ 30 (alteration supplied). Smith also reminded plaintiff that she should always follow the chain of command when she had a problem at work, and if she did not like the response she received at any level, she should take her complaint to the next highest level.[85] Plaintiff responded that she believed she had been following the chain of command by complaining to Nichols and Smith about her co-workers' harassment.[86] Plaintiff signed the written disciplinary notice that was issued to her, but she did not read it before doing so because she was too discouraged and frustrated.[87] Hogan, Turner, and Wade did not receive any disciplinary action.[88]

When plaintiff returned to work after her three-day suspension, her job duties changed. She was no longer a "floater," she no longer performed audits, and she complained that she and John Foster, another African-American employee, were given more work than white employees in the same work area. Even so, she

---

[85] Doc. no. 42-2 (Deposition of Shiama Ray), at 149-50.

[86] *Id.* at 147.

[87] *Id.* at 147, 210-11.

[88] Doc. no. 42-4 (Deposition of David Smith), at 214.

acknowledged that the white employees who received less work than she and John Foster did not have the same job title as she and Foster did.[89]  Despite those negative changes, plaintiff acknowledged that, after she returned to work, her work station no longer was located near Hogan, Turner, or Wade, and the work environment was "quiet" and "peaceful."[90]  Moreover, since plaintiff returned to work after her suspension, whenever she has raised a workplace issue with Smith or Truss, the issue has been resolved to her satisfaction.[91]

### 11. Metals Lab Technician position

A position for Metals Lab Technician, which carried a higher rate of pay than plaintiff's position of Quality Control Inspector, came open in either June or November of 2013.[92]  The position was posted in the usual manner, but plaintiff did not apply for it because she had recently been given an assignment with which she was not happy, and she had been taking more days off work than usual.  As a result,

---

[89] Doc. no. 42-2 (Deposition of Shiama Ray), at 115-17, 157, 161-64.

[90] *Id.* at 150-51.

[91] *Id.* at 152-53.

[92] During plaintiff's deposition, she responded to counsel's questions about a metals lab technician position in *June* of 2013.  *Id.* at 156-57.  Even so, defendant stated in its summary judgment brief that the position came open in *November* of 2013.  Doc. no. 43 (Brief in Support of Defendant's Motion for Summary Judgment), at ECF 20, ¶ 118 ("In November 2013 a Technician position in the Metals Lab became available.").  Plaintiff admitted that proposed fact in her summary judgment response brief.  Doc. no. 57 (Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment), at ECF 14 ("108-111.  Admitted.").  *See also* doc. no. 42-5 (Deposition of Lance Nichols), at 126.

she had incurred so many disciplinary "points" due to excessive absences that she subjectively believed she was not eligible to even write her name on the bid sheet for the position.[93] A white-male employee named Matthew Lay applied for and received the position.[94] Plaintiff believes Lay was "hand picked" for the position, because he was allowed to train in the metals lab in order to escape a supervisor he did not like in his previous work area.[95] Plaintiff, on the other hand, had already been trained in the metals lab, and she could have started as a Metals Lab Technician in 2013 without any additional training.[96] Moreover, both Lance Nichols and David Smith testified that plaintiff would have been qualified for the position.[97]

### 12. Plaintiff's other complaints about Lance Nichols

At some point that cannot be clearly discerned from the record, Lance Nichols began recording notes about plaintiff's workplace behavior. He did not record similar notes about any other employees.[98] Nichols also testified that he attempted to talk to plaintiff and John Foster, another African-American employee, as little as possible,

---

[93] Doc. no. 42-2 (Deposition of Shiama Ray), at 165-66.

[94] *Id.* at 157-58, 191-92.

[95] *Id.* at 159-60.

[96] *Id.* at 165-66.

[97] Doc. no. 42-5 (Deposition of Lance Nichols), at 123, 126; doc. no. 42-4 (Deposition of David Smith), at 178.

[98] Doc. no. 42-7 (Second Deposition of Lance Nichols), at 157.

but he did not say that was because of their race.[99]

At some point after plaintiff complained about Hogan, Turner, and Wade rushing her to complete "hot jobs," Nichols began asking plaintiff, and *only* plaintiff, to leave her ordinary job duties to inspect items that had been returned by customers.[100]

### 13. Noose

During December of 2013, a rope fashioned as a noose was seen hanging in the maintenance area at Lee Brass. Many of the employees were "distraught" about it. Plaintiff never saw the noose while it was hanging, but she did "glance[] at it" after it had been taken down and was about to be thrown in the trash.[101] Plaintiff testified that, other than glancing at the noose, she "didn't pay  no attention to" it, and she grew tired of other employees discussing it.[102]

John Foster reported the noose to Lance Nichols. Nichols went to the maintenance area to investigate, but he did not see anything suspicious, and he did not take any further action and did not report it to upper management or Human

---

[99] *Id.* at 162.

[100] Doc. no. 42-2 (Deposition of Shiama Ray), at 109-11.

[101] *Id.* at 184-86 (alteration supplied).

[102] *Id.* at 186 ("I didn't pay no attention to that. I mean, I saw the rope tied up like a noose and that was that. It was throwed away and I didn't — they talked about it so much, you know, it was kind of like — after hearing about it every day for about a week, it was like, okay, I don't want to hear this anymore, you know.").

Resources.[103]  Indeed, Jerome Truss did not learn about the noose until after Foster filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  Truss was upset that Nichols had not informed him earlier, but he did not discipline Nichols for that failure.  In fact, no employee received any disciplinary action for the noose incident.[104]

Plaintiff saw another noose hanging in the Lee Brass facility just a few weeks before she executed her declaration on October 5, 2016.[105]

### 14.    Nora Woods' Facebook comment

Nora Woods, a white lead employee, posted the following comment on her private Facebook account on August 17, 2014:  "This is not my circus . . . and these are not my monkeys."[106]  Woods had been out of work for a few weeks, and her post referenced her impending return to work.  She explained to Jerome Truss that the phrase meant, "hey, I take care of myself, and I don't get in anybody else's business."[107]  But many of the black employees who viewed the post, including plaintiff, believed that the reference to monkeys was racially inflammatory.[108]  In fact,

---

[103] Doc. no. 42-5 (Deposition of Lance Nichols), at 52-54.

[104] Doc. no. 56-1 (First Deposition of Jerome Truss), at 168-70.

[105] Doc. no. 56-15 (Declaration of Shiama Ray), at ¶ 4.

[106] Doc. no. 56-1 (First Deposition of Jerome Truss), at 145-46, 150; doc. no. 56-2 (Second Deposition of Jerome Truss), at 48.

[107] Doc. no. 56-1 (First Deposition of Jerome Truss), at 146-47.

[108] Doc. no. 56-2 (Second Deposition of Jerome Truss), at 34-35; doc. no. 56-15 (Declaration

the comment caused so much hostility among black employees that members of management advised Woods not to eat with or enter the shower room with black employees for her own safety.[109]  Woods received a written reprimand on September 24, 2014, stating:

> The posting that you placed on your Facebook page on Thursday, August 17, 2014, "This Is Not My Circus, These Are Not My Monkeys" was inappropriate and was offensive to several of your co-workers.
>
> By using Lee Brass in the posting, [you] made it a Company issue because of your Lead Person role here with the Company.  We expect our leaders to demonstrate the ability to censor their information at work and also on Social Media.  This type of behavior causes dissension in the workplace that is a cancerous element in trying to development [*sic*] harmonious relations.
>
> This letter is being put in your personnel file and if you demonstrate this type of behavior again during your tenure here with Lee Brass your employment will be subjected to immediate termination.
>
> Again we need our leaders to demonstrate a positive attitude to all Associates and discretion has to be used in our communication whether it's verbally or on Social Media.
>
> Nora we expect you to take this matter very seriously because it has affected your role as Lead Person and if it is not corrected, it can and will affect your leadership role moving forward.

Doc. no. 56-20 (September 24, 2014 Written Reprimand) (alteration supplied).

---

of Shiama Ray), at ¶ 9.

[109] Doc. no. 56-2 (Second Deposition of Jerome Truss), at 35.

Despite the reprimand, Woods was allowed to retain her position as a Lead Person.[110]

### 15. Robert Smith's comments about plaintiff

Robert Smith, the President of Lee Brass, testified during his deposition that he would not say that plaintiff is a good employee, because of his opinion that she is a "troublemaker."[111] He clarified that he did not think plaintiff was a troublemaker because she complained about harassment or discrimination, or because she filed an EEOC charge. Instead, the problem was that plaintiff "can't get along with anybody."[112] Robert Smith was concerned that multiple Lee Brass employees had filed EEOC charges alleging race discrimination, but he also thinks that "a lot of people use that as a way to avoid discipline and getting out of work."[113]

### D. Plaintiff's EEOC Charge

Plaintiff filed an EEOC charge on November 21, 2013, alleging race-based harassment, race-based discrimination, and retaliation.[114] The EEOC issued a notice of right to sue on December 30, 2014.[115]

---

[110] Doc. no. 56-2 (Second Deposition of Jerome Truss), at 49.

[111] Doc. no. 56-5 (Deposition of Robert Smith), at 100.

[112] *Id.* at 100-01.

[113] *Id.* at 111-13.

[114] Doc. no. 42-2, at ECF 72-73 (EEOC Charge).

[115] *See* doc. no. 1 (Complaint), at ¶ 9. The court cannot locate a copy of the right-to-sue letter in the record, but defendant does not appear to contest that such a letter was issued, or that plaintiff filed suit within the prescribed time period.

# IV. DISCUSSION

Plaintiff brought her claims under both 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII").[116] Both statutes "have the same requirements of proof and use the same analytical framework . . . ." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (ellipsis supplied).

## A.    Racially-Hostile Work Environment

Plaintiff must provide proof of five elements in order to establish a *prima facie* racially-hostile work-environment claim:  (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon her race, African-American; (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of her employment and create a discriminatory abusive working environment; and (5) her employer is liable for the environment under a theory of either direct or vicarious liability.  *See, e.g.*, *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002).

As an African-American, plaintiff clearly belongs to a protected group.  She also was subjected to conduct that she found unwelcome.  The other elements of the claim require closer consideration, however.

---

[116] *See* doc. no. 1 (Complaint).

As an initial matter, the pressure plaintiff received (or perceived) from her co-workers to quickly complete "hot jobs" cannot be considered race-based harassment. Personal conflicts between employees cannot serve as the basis for a Title VII claim, if they do not arise from the aggrieved employee's racial heritage. "Title VII prohibits discrimination; it is not a shield against harsh treatment at the work place. Personal animosity is not the equivalent of [race] discrimination. . . . The plaintiff cannot turn a personal feud into a [race] discrimination case. . . ." *Succar v. Dade County School Board*, 229 F.3d 1343, 1345 (11th Cir. 2000) (*per curiam*) (quoting *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986) (alterations supplied, footnote and internal quotation marks omitted)). Regardless of the factual context in which the employees' dispute arises, the court's analysis of a Title VII harassment claim should focus only upon whether the complaining employee was targeted *because of* her membership in a protected category. *Succar*, 229 F.3d at 1345. Here, there is no connection between plaintiff's race and her co-workers' behavior. Plaintiff asserts that the pressure her co-workers placed on her to quickly complete "hot jobs" was race-based because it did not commence until after she complained to Lance Nichols and Bill Boozer about Curtis Clay's Martin Luther King Day comment. That argument might be appropriate for a retaliation claim, but it does not transform the treatment to which plaintiff was subjected into race-based harassment.

The only arguably race-based incidents to which plaintiff was subjected include: Curtis Clay's Martin Luther King Day comment in January of 2013; Jackie Hogan's two comments about food stamps during April and May of 2013; Hogan's comment about Trayvon Martin on some undisclosed date; plaintiff's viewing of a noose in the maintenance shop during December of 2013; and Nora Woods' August 2014 Facebook comment about monkeys.[117] Plaintiff cannot demonstrate that those incidents, even considered collectively, were sufficiently severe or pervasive to alter the terms and conditions of her employment and create a racially-abusive working environment. The "severe or pervasive" element contains both an objective and a subjective component. To satisfy that element, plaintiff must show *both* that she subjectively believed the environment to be racially hostile or abusive, *and* that a reasonable person also would perceive it as such. *See, e.g., Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-22 (1993).

When evaluating the objective severity of offensive conduct, courts examine the totality of circumstances, including such factors as: the frequency of the conduct;

---

[117] The court must only consider comments and incidents of which plaintiff was actually aware, not incidents that happened to other people and of which she heard after the fact. *See Adams v. Austal, U.S.A., L.L.C.,* 754 F.3d 1240, 1250 (11th Cir. 2014) ("We agree with these courts that a district court should not consider evidence of racial harassment of other employees — evidence that the plaintiff did not know about — in evaluating the objective component of a claim of a hostile work environment.").

the severity of the conduct; whether the conduct was threatening or humiliating, or a mere offensive utterance; and, whether the conduct unreasonably interfered with plaintiff's work performance. *See, e.g., Johnson v. Booker T. Washington Broadcasting Service, Inc.,* 234 F.3d 501, 509 (11th Cir. 2000) (quoting *Mendoza v. Borden, Inc.,* 195 F.3d at 1238,1246 (11th Cir. 1999)); *Edwards v. Wallace Community College,* 49 F.3d 1517, 1521 (11th Cir. 1995). It is not necessary to prove each of the factors individually. However, the factors, taken together, must reveal conduct that is so extreme that it caused a material change in the terms and conditions of plaintiff's employment, and created a working environment that a reasonable person would find discriminatorily abusive. *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citations omitted).

Here, the behavior to which plaintiff was subjected, taken as a whole, simply does not add up to a racially-hostile and abusive work environment. Five incidents over a span of approximately twenty months is not frequent. *Compare Miller,* 277 F.3d at 1276 (holding that verbal ethnic slurs uttered by a co-employee "three to four times a day" throughout the approximately one-month period plaintiff worked with the employee were sufficiently frequent) *and Johnson,* 234 F.3d at 509 (holding that "roughly fifteen separate instances of harassment over the course of four months" was sufficiently frequent) *with Mendoza,* 195 F.3d at 1248-49 (holding that four incidents

over an eleven-month period were not sufficiently frequent to merit judicial scrutiny*)*, *Shepherd v. Comptroller of Public Accounts of Texas,* 168 F.3d 871, 872-75 (5th Cir. 1999) (holding that *several* incidents over a two-year period were not frequent), *and Baskerville v. Culligan International Co.,* 50 F.3d 428, 430 (7th Cir. 1995) (holding that nine instances of offensive behavior over seven months were not sufficient to be characterized as "frequent").

Moreover, the food stamp and Facebook comments cannot be considered severe or threatening, because any connection between those comments and race is tenuous. The Martin Luther King Day comment is more closely connected to plaintiff's race, but it was neither severe nor threatening. The Trayvon Martin comment could be considered more severe and threatening, in view of the fact that discussions about the tragic death of Trayvon Martin evoke images of a racially charged shooting. Moreover, a noose is a historically-significant symbol of race-based terrorism and oppression. Even so, the threatening effect of those incidents is arguably mitigated by the fact that Jackie Hogan said Trayvon Martin deserved to be shot because he provoked his attacker, not because of his race. Moreover, while the presence of the a noose in a workplace can never be justified, and is deserving of the most severe condemnation, any connection between the noose and plaintiff is tenuous at best. *See Cunningham v. Austal*, *U.S.A., L.L.C*, No. CIV.A. 08-00155-KD-N, 2011

WL 3924185, at *6 (S.D. Ala. Sept. 7, 2011) ("[T]he Eleventh Circuit has not held that the temporary display of a noose by a rogue employee creates a *per se* hostile work environment.") (alteration supplied). In addition, there is no indication that any of the race-based comments or incidents unreasonably interfered with plaintiff's work performance.[118]

The final element of a hostile work environment claim — a basis for holding the employer liable — also cannot be satisfied. Because all of the harassment plaintiff allegedly endured was from co-workers, and not from a supervisor, defendant can be held liable for that harassment only if the company officers or supervisors either knew, or should have known, of the alleged harassment, but failed to take prompt and appropriate remedial action. *See, e.g.*, *Faragher*, 524 U.S. at 799 (collecting cases); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 759 (1998) ("Negligence sets a minimum standard for employer liability under Title VII."); *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003) ("When . . . the alleged harassment is committed by co-workers or customers, a Title VII plaintiff must show that the employer either knew (actual notice) or should have known

---

[118] The pressure plaintiff received from her co-workers to quickly complete "hot jobs" did interfere with plaintiff's work performance, as evidenced by the fact that she felt compelled to leave her work station and call the police. Even so, as previously discussed, that incident had nothing to do with plaintiff's race. With regard to the noose, plaintiff testified that she did not pay much attention to the noose, and she was relieved when other employees ceased talking about it. Doc. no. 42-2 (Deposition of Shiama Ray), at 186.

(constructive notice) of the harassment and failed to take immediate and appropriate

corrective action.").

> Actual notice is established by proof that management knew of the harassment. *Miller*, 277 F.3d at 1278. When an employer has a clear and published policy that outlines the procedures an employee must follow to report suspected harassment and the complaining employee follows those procedures, actual notice is established. *Breda*[ *v. Wolf Camera & Video*], 222 F.3d [886,] 889[ (11th Cir. 2000)]; *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1364 (11th Cir. 1999). Constructive notice, on the other hand, is established when the harassment was so severe and pervasive that management reasonably should have known of it. *Miller*, 277 F.3d at 1278.

*Watson*, 324 F.3d at 1259. "[A]n employer need not act instantaneously, but must act

in a reasonably prompt manner to respond to the employee's complaint." *Frederick*

*v. Sprint/United Management Co.*, 246 F.3d 1305, 1314 (11th Cir. 2001) (citing

*Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1302 (11th Cir. 2000))

(alteration supplied). Similarly, an employer's remedial measure is adequate if it is

"reasonably likely to prevent the misconduct from recurring." *Baldwin v. Blue*

*Cross/Blue Shield of Alabama,* 480 F.3d 1287, 1305 (11th Cir. 2007) (internal

quotation marks and citations omitted).

The only alleged race-based harassment about which plaintiff complained prior

to filing her EEOC charge was Curtis Clay's Martin Luther King Day comment.[119]

---

[119] Plaintiff claims that she often complained about her co-workers "harassing" her to quickly complete "hot jobs," but as has already been stated, that alleged harassment was not race-based.

There is no indication that defendant had actual notice of any of the other race-based incidents, or that any race-based harassment plaintiff endured was so severe and pervasive that management reasonably should have known about it. When plaintiff reported Clay's comment to Bill Boozer, the Quality Control Manager at the time, Boozer immediately addressed the issue with Clay's supervisor. There is no indication that plaintiff ever experienced any additional problems with Clay after reporting the Martin Luther King Day comment. Accordingly, there is no basis for holding defendant liable for any of the alleged harassment suffered by plaintiff.

Because plaintiff cannot satisfy all elements of her hostile work environment claim, summary judgment is due to be granted on that claim.

## B.    Race Discrimination

Plaintiff claims that she suffered race discrimination when she was suspended and when she failed to receive the Metals Lab Technician position.[120] She does not claim to have direct evidence of a race-based discriminatory animus. Therefore, she

---

[120] To the extent plaintiff formerly asserted any other instances of race-based discrimination, she has since abandoned those claims by not responding to defendant's well-founded arguments about why summary judgment should be granted on those claims. Issues and contentions not raised in a party's brief are deemed abandoned. *See, e.g.*, *Chapman,* 229 F.3d at 1027 ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

must prove her claims with circumstantial evidence, navigating the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981). Under that analytical framework, a plaintiff must first establish a *prima facie* case of disparate treatment, which creates a presumption of discrimination. To rebut the presumption, the employer then must articulate a legitimate, nondiscriminatory reason for the disputed employment action. If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely a pretext for unlawful discrimination. *See McDonnell Douglas,* 411 U.S. at 802-05; *Burdine,* 450 U.S. at 252-56.

### 1.    Suspension

"To establish a prima facie case for disparate treatment, [plaintiff] must show that '(1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated [white] employees more favorably; and (4) she was qualified to do the job.'" *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008) (quoting *EEOC v. Joe's Stone Crab, Inc*., 220 F.3d 1263, 1286 (11th Cir. 2000)) (first alteration supplied, second alteration in *McCann*). As an African-American, plaintiff clearly is a member of a protected class, and her suspension clearly was an adverse employment action. Even so, plaintiff

acknowledges that she cannot establish a *prima facie* case of discrimination under the *McDonnell-Douglas* framework, because "there is no evidence tha[t] any other employee called the police to report racial harassment and retaliation."[121] Instead, she asserts that there is additional circumstantial evidence sufficient to demonstrate a discriminatory intent.

The Eleventh Circuit held in *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011), that "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Id.* at 1328. The white plaintiff in that case was unable to establish a *prima facie* case of race discrimination because he could not identify a similarly situated black comparator who was treated more favorably than he was. *Id.* at 1327-28. Even so, the Eleventh Circuit held that the "convincing mosaic of circumstantial evidence" in the record gave rise to an inference of discrimination. *Id.* at 1328 (quoting *Silverman v. Board of Education of City of Chicago*, 637 F.3d 729, 734 (7th Cir. 2011)). The pertinent circumstantial evidence included: a backdrop of racial tension in the company following a racially-motivated shooting less than two years earlier; an upcoming television news special expected to portray the company's handling of

---

[121] Doc. no. 57 (Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment), at ECF 37 (alteration supplied).

racism at the workplace, both before and after the shooting, in an extremely unflattering light; and, the company's inclusion of race in a human resources spreadsheet used in determining the appropriate disciplinary action for each employee (including the plaintiff) implicated in the distribution of a racist email. *Id.* at 1329-40. Those factors cumulatively demonstrated that the employer "had a substantial incentive to discipline white employees more harshly than black employees," and "consciously injected race considerations into its discipline decision making without an adequate explanation for doing so." *Id.* at 1341.

Plaintiff asserts that a similarly racially-charged environment existed at Lee Brass because white employees "engaged in racially-offensive conduct while Lee Brass turned a blind eye."[122] Specifically, she references: (1) Jason Alexander's use of the racial slur "nigger" and display of racially offensive posters that resulted in only a written warning; (2) Nora Woods' racially offensive Facebook post that resulted in only a written warning; (3) Curtis Clay's Martin Luther King Day comment, which did not result in any disciplinary action; and (4) Jackie Hogan's multiple, racially-offensive comments, for which she also was not disciplined. According to plaintiff, those incidents create an inference of discrimination based upon the unpublished decision from another judge of this court in *Perry v. Supreme*

---

[122] *Id.* at ECF 38.

*Beverage Co.*, No. 2:11-CV-00060-MHH, 2015 WL 128586 (N.D. Ala. Jan. 9, 2015) (Haikala, J.).

In *Perry*, the district court held that, while the black plaintiff's alleged misconduct was not sufficiently similar to that of his alleged white comparator to satisfy a *prima facie* case of race discrimination, the similarities were sufficient to give rise to an inference of discrimination under *Smith*, especially considering that the employer had "demonstrated a quick trigger finger" with regard to the plaintiff in the past, while it had a history of offering the white comparator "second chances." *Id.* at *2. The court also considered that the employer typically gave white employees preferable work assignments, and offered them assistance that was not also offered to black employees. *Id.* at *3.

Plaintiff's argument is not persuasive. As an initial matter, the *Perry* decision is an unpublished decision from another district judge, and it is not binding authority. Moreover, while other Lee Brass employees have received less severe disciplinary sanctions in race-related situations than the three-day suspension imposed upon plaintiff, none of those employees engaged in misconduct that was remotely similar to plaintiff's. Finally, there is no history of defendant reacting more severely in other disciplinary situations involving plaintiff than it did in situations involving other employees. In summary, there is not sufficient circumstantial evidence of a racially

charged work environment to give rise to an inference of discrimination.

Even if there were sufficient circumstantial evidence, defendant has proffered a legitimate, non-discriminatory reason for plaintiff's suspension: *i.e.,* that plaintiff's decision to leave her work station and call the police to address a workplace dispute was an overreaction and could not be tolerated because it "would set a bad precedent and lead to more incidences of employees calling the police without cause."[123]

Thus, plaintiff can survive summary judgment on her discriminatory suspension claim only if she comes "forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas,* 411 U.S. at 804). Plaintiff's burden at this step of the analysis is that of "cast[ing] sufficient doubt on the defendants' proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct . . . .'" *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994)) (alteration supplied); *see also Chapman*, 229 F.3d at 1024-25. Plaintiff

---

[123] Doc. no. 43 (Brief in Support of Defendant's Motion for Summary Judgment), at ECF 29.

shoulders that burden by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Company*, 100 F.3d 1061, 1072 (3d Cir. 1996)) (internal quotation marks omitted).

Plaintiff does not make any additional argument about why defendant's proffered legitimate reason should not be credited. Instead, she simply reasserts the same arguments upon which she relied to argue that there was circumstantial evidence of discrimination. For the same reasons that evidence was not sufficient to raise an inference of discrimination, it also is not sufficient to undermine defendant's proffered legitimate, non-discriminatory reason for suspending plaintiff's employment. There is no reason to believe that defendant actually suspended plaintiff because of her race, especially considering that the alleged "harassment" precipitating plaintiff's telephone call to the police was not race-based. Accordingly, summary judgment is due to be granted in defendant's favor on plaintiff's discriminatory suspension claim.

### 2. Metals Lab Technician position

Plaintiff also asserts that her failure to receive the Metals Lab Technician position was the result of race discrimination. For such a claim, plaintiff must

establish the following elements of a prima facie case: she is a member of a protected group; she applied for, and was qualified to fill, a position for which the defendant was accepting applications; despite her qualifications, she was rejected for the position; and, after her rejection, the employer *either* kept the position open, *or* filled it with a person outside plaintiff's protected class. *See, e.g.*, *Walker v. Mortham*, 158 F.3d 1177, 1179 n.2, 1185-93 (11th Cir. 1998) (explaining that a plaintiff need not introduce evidence of the relative qualification of the person promoted instead of plaintiff as part of her prima facie case for failure to promote).

Plaintiff cannot satisfy the *prima facie* case because she did not apply for the Metals Lab Technician position. She believed that she was not eligible to apply. Even though that belief was mistaken, there is no evidence that defendant misled her about her eligibility. Plaintiff complains that she formed her mistaken belief because she had too many absences, and she only had those absences because defendant had placed her in a position she did enjoy occupying. But she has offered no authority, and this court has located none, to support the argument that defendant should be held responsible for her mistaken belief, or for her decision not to come to work. Plaintiff's race discrimination claim based upon her failure to receive the Metals Lab Technician cannot succeed.

**C.     Retaliation**

Plaintiff also asserts that her suspension and failure to receive the Metals Lab Technician position were the result of unlawful retaliation.[124] "Retaliation is a separate violation of Title VII." *Gupta v. Florida Board of Regents,* 212 F.3d 571, 586 (11th Cir. 2000). A plaintiff generally must prove three elements to establish a *prima facie* case of retaliation: she engaged in statutorily protected expression; she suffered an adverse employment action; and, there was a causal linkage between the protected conduct and the adverse employment action. *See, e.g., Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 715 (11th Cir. 2002).

> Once plaintiff establishes a prima facie case [of retaliation] by proving only that the protected activity and the negative employment action are not completely unrelated, the burden shifts to the defendant to proffer a legitimate reason for the adverse action . . . . The burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the "legitimate" reason is merely pretext for prohibited, retaliatory conduct.

*Sierminski v. Transouth Financial Corporation*, 216 F.3d 945, 950 (11th Cir. 2000) (citations omitted, alteration supplied).

Even if plaintiff could establish a *prima facie* case of retaliation with regard to her suspension or her failure to receive the Metals Lab Technician position, she cannot refute defendant's proffered legitimate, non-retaliatory reasons for those

---

[124] It actually is unclear from plaintiff's brief whether she asserts that her failure to receive the Metals Lab Technician position was the result of retaliation, or just discrimination. Giving plaintiff the benefit of the doubt, the court will assume that she intended to assert both discrimination and retaliation claims based upon that conduct.

employment decisions. As discussed above, defendant asserts that it suspended plaintiff because it wanted to send the message that calling the police to resolve a workplace dispute was not acceptable conduct, and plaintiff has offered nothing to discredit that explanation. Defendant asserts that plaintiff did not receive the Metals Lab Technician position because she did not apply for it, and plaintiff has offered no evidence to discredit that assertion. While plaintiff mistakenly believed that she was not eligible to apply for the position, she offers no evidence that defendant did anything to further that mistaken belief. Accordingly, defendant is entitled to summary judgment on plaintiff's retaliation claim.

## D.   "Me Too" Evidence

Finally, plaintiff asserts that she has presented sufficient "me too" evidence to support her claims. The Eleventh Circuit has held that evidence of discriminatory acts suffered by other employees can be used, under certain circumstances, to prove an employer's intent to discriminate. *Goldsmith v. Bagby Elevator Co., Inc.,* 513 F.3d 1261, 1286 (11th Cir. 2008).[125] Typically, such "me too" evidence will be allowed if it involves employment decisions made by the same person who made the decisions

---

[125] This holding is consistent with Federal Rule of Evidence 404(b), which states that while evidence of other crimes, wrongs, or other acts is not admissible "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," it is admissible for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b).

affecting the plaintiff, and if the witness (the other employee offering evidence of alleged discrimination) held a position similar to the plaintiff's and experienced an employment situation similar to the plaintiff's. *Id.* More specifically, another judge in this district has stated that the following factors should be considered in determining whether to admit "me too" evidence:

> whether the allegations of discrimination occurred close in time to [the plaintiff's] allegations, whether the other employees alleging discrimination had similar job positions as [the plaintiff], whether they were demoted or terminated for reasons similar to Defendants' proffered reason for demoting [the plaintiff], and whether there was a common decisionmaker.

*Davis v. Dunn Construction Co.,* 872 F. Supp. 2d 1291, 1318 (N.D. Ala. 2012) (Proctor, J.) (alterations supplied). It must also be remembered that, "[e]ven when 'me too' evidence is relevant under Rule 401, the district court retains the discretion to exclude that evidence, under Rule 403, if it is unduly prejudicial, confusing, misleading, or cumulative." *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1258 (11th Cir. 2014) (alteration supplied).

It is unclear whether plaintiff is offering the purported "me too" evidence to support her harassment claim, her race discrimination claim, her retaliation claim, or all three. It also is unclear whether plaintiff contends that the evidence constitutes proof of her *prima facie* case, or pretext, or whether it is simply other circumstantial

evidence of discriminatory or retaliatory intent. The purpose for which the information is being offered is irrelevant, however, because what plaintiff has offered is not "evidence" at all. Instead, plaintiff points to EEOC charges and district court complaints filed by other Lee Brass employees.[126] The complaints are not verified, and plaintiff has not offered any testimony by way of deposition or affidavit from the other employees who filed those charges and complaints. She also has not put forth any effort to describe the other employees' claims in any detail, or to identify the similarities between those claims and her own, including similar jobs, common decision makers, or similar employment decisions being made for similar reasons. Instead, she only states:

> In this case, the "me too" evidence of numerous other EEOC charges, lawsuits and internal complaints supports Ray's claims of motive as well as hostile environment, as outlined in *Goldsmith*. The claims made by other employees were in the same time frame as were those made by Ray, and were often being addressed by Truss at the same time Ray was making complaints. Ray was aware of other acts of discrimination that were not directed at her specifically.

Doc. no. 57 (Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment), at ECF 42. Those conclusory allegations and vague references to claims asserted by other employees are insufficient to carry a claim for harassment,

---

[126] *See* doc. no. 57 (Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment), at ECF 18, Plaintiff's Proposed Facts 2-3 (discussing complaints filed by Michael Judkins and Jerald Seals, and EEOC charges filed by Genika Owens, Marquis Mason, and John Foster).

discrimination, or retaliation.

In so holding, the court finds persuasive the decision of Judge Proctor in *Davis v. Dunn Construction Co.*, 872 F. Supp. 2d 1291 (N.D. Ala. 2012). There, the plaintiff offered "me too" evidence consisting of "racial discrimination *claims* that were dismissed on summary judgment, EEOC Charges that never resulted in lawsuits, and sworn testimony from an employee stating that [a co-worker] was disrespectful towards African-American employees." *Id.* at 1318 (emphasis in original, alteration supplied). The court referred to that evidence as "a hodgepodge of unproven *allegations* of discrimination," "a watered-down version of 'me too' evidence," and found that the evidence was insufficient to create an inference that the plaintiff had suffered any discrimination. *Id.* (emphasis in original). Significantly, Judge Proctor stated: "It would be unproductive and unnecessary for the court to parse through Plaintiff's evidence to explain why each specific piece of evidence concerning [other employees] is not relevant to Plaintiff's case, particularly since Plaintiff has not bothered to explain why he believes this evidence is relevant." *Id.* (alteration supplied) (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment"). That was particularly true in the *Davis* case, considering the plaintiff's

reliance upon other employees' EEOC charges, because those charges would not be admissible in evidence under Federal Rule of Evidence 403. *Id.* at 1318-19.

The court will not do the work of formulating potential arguments on plaintiff's behalf, particularly not ones that are based upon inadmissible evidence.[127] There is no reason to conclude, based upon the information presented to this court, that other employees have suffered sufficiently similar discriminatory or retaliatory treatment under circumstances sufficiently similar to those presented here, to justify an inference of discrimination or retaliation against plaintiff.[128]

## V. CONCLUSION AND ORDER

In accordance with the foregoing, plaintiff's motion to strike is DENIED. Defendant's motion for summary judgment is GRANTED, and it is ORDERED that all of plaintiff's claims are DISMISSED with prejudice. Costs are taxed to plaintiff. The Clerk is directed to close this file.

---

[127] It is also worth nothing that plaintiff has not discussed how any of her purported evidence could be presented in admissible form at trial.

[128] Plaintiff also makes the argument that defendant's attempts to hide and/or minimize the evidence of other employees' complaints of discrimination and retaliation make the "me too" evidence even more probative. That argument is immaterial, however, because plaintiff's purported "me too" evidence is not actually evidence, and plaintiff has not sufficiently developed her argument that the situations faced by other employees should give rise to an inference of discrimination in her own situation.

DONE this 21st day of June, 2017.

_____
United States District Judge